# STATE OF CONNECTICUT *v.* JAMES A.*
## (SC 20453)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of sexual assault in the first degree, sexual assault in the second
degree, risk of injury to a child, strangulation in the first degree, threaten-
ing in the second degree, and disorderly conduct in four cases that were
joined for trial, the defendant appealed to this court. The two cases
involving the sexual assault, risk of injury, and strangulation charges
arose from the defendant's sexual abuse of J and L, the daughters of
the defendant's then girlfriend, D, and his choking of J to the point

---

* In accordance with our policy of protecting the privacy interests of the
victims of sexual abuse and the crime of risk of injury to a child, we decline
to use the defendant's full name or to identify the victims or others through
whom the victims' identities may be ascertained. See General Statutes
§ 54-86e.

   Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3)
(2018), as amended by the Violence Against Women Act Reauthorization
Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to
identify any person protected or sought to be protected under a protection
order, protective order, or a restraining order that was issued or applied
for, or others through whom that person's identity may be ascertained.

JANUARY, 2023

State *v.* James A.

of unconsciousness on one occasion. The threatening and disorderly conduct charges in the other two cases arose from the defendant's conduct in connection with two incidents that occurred soon after he and D were married. During the wedding after-party, D's eldest daughter, S, accused the defendant of sexually abusing J and called him a "pedophile son of a bitch." In response to S's accusation, the defendant became extremely agitated and threatened to decapitate S, D, and other family members if any charges were brought against him, grappled with S's father, A, who had intervened to protect S, punched a hole in the wall, flipped over a table, shattering a chandelier in the process, and thereafter screamed at the remaining guests. Thereafter, S, J, L, and other family members departed for A's house. The following night, after J disclosed the defendant's sexual abuse and her allegations were reported to the police, the defendant arrived at A's house and peered into the living room where J and L were sleeping. D's father, M, and A confronted the defendant with their guns drawn and ordered him to leave the premises. The defendant proceeded to taunt M and then threw an open can of beer and charged at M. M shot the defendant, and the police arrived shortly thereafter. The defendant was charged in separate informations with threatening in the second degree, in connection with his conduct at the after-party, and with disorderly conduct, in connection with his conduct at A's house. The state moved to consolidate the four cases for trial. Although the defendant did not object to the consolidation of the two sexual assault cases, he filed a motion to sever, arguing that the threatening and disorderly conduct cases should be tried separately from the sexual assault cases. The trial court nevertheless granted the state's motion to consolidate and denied the defendant's motion to sever, concluding that the evidence in the sexual assault cases and the threatening and disorderly conduct cases was cross admissible and that, under *State* v. *Boscarino* (204 Conn. 714), joinder would not be unduly prejudicial to the defendant. The trial court also granted the defendant's pretrial motion in limine, barring the state from inquiring about the defendant's prior felony record. During the prosecutor's direct examination of M, however, M testified that, at the wedding after-party, the defendant yelled that he was not going back to jail. The court struck that testimony and gave a curative instruction, but it denied defense counsel's request, as a remedy for M's improper disclosure, that the defendant be allowed to testify about the nonsexual nature of his prior felony convictions without opening the door to being asked on cross-examination about the name or nature of those felonies. The defendant ultimately opted not to testify. On the defendant's appeal from the judgment of conviction, *held*:

1. The defendant could not prevail on his claim that the trial court had abused its discretion when it joined the defendant's sexual assault cases and his threatening and disorderly conduct cases for trial, as the evidence in each case was cross admissible in the other cases:

State *v.* James A.

a. This court clarified the procedures involved in the trial court's determination of whether joinder is proper:

The trial court first must consider whether, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other, which requires consideration of whether the evidence in each of the cases is relevant in the other case or cases and, if the evidence is relevant, whether admission of the evidence relating to each of the cases would be more probative than prejudicial in the other case or cases.

If the court determines that the evidence in each case is relevant in the other case or cases and that its admission would be more probative than prejudicial, the evidence is cross admissible, and the cases may be joined; if the court determines that the evidence in one case is relevant to the other case or cases but that its admission would be more prejudicial than probative, the evidence is not cross admissible, and the cases may not be joined.

If the court determines that the evidence in one case is not relevant in the other case or cases, it must determine whether joinder of the cases would be unduly prejudicial by applying the factors set forth in *Boscarino*, including whether the charges involve discrete, easily distinguishable factual scenarios, whether the crimes were of a violent nature or concerned brutal or shocking conduct, and the duration and complexity of the trial if the cases were to be joined.

b. There was no merit to the defendant's contention that, for evidence to be cross admissible, all evidence from each case must be fully admissible in each of the other cases:

The defendant's claim regarding the proper standard for joinder was inconsistent with this court's well established joinder jurisprudence, which holds that cross admissibility is not defeated by virtue of the fact that evidence may be admitted only for a limited purpose in one of the cases to be joined and that the state must prove either that the evidence in the cases is cross admissible or that joinder will not unfairly prejudice the defendant pursuant to the *Boscarino* factors.

Moreover, requiring full, bilateral and actual cross admissibility would defeat the benefits of judicial economy and providing context for the trier that are afforded by joinder.

c. The trial court did not abuse its discretion in determining that evidence of the conduct that gave rise to the charges in the threatening and disorderly conduct cases was admissible in the sexual assault cases:

The evidence in the threatening and disorderly conduct cases was relevant in the sexual assault cases, as the defendant's violent reaction to S's accusation of sexual abuse at the after-party, which underlay the threatening and disorderly conduct charges, tended to establish that he

State *v.* James A.

was intent on preventing the victims from disclosing the allegations of sexual abuse to the authorities, which, in turn, demonstrated his consciousness of guilt and tended to make it more probable that he had committed the sexual abuse, and the defendant's reaction to the accusations also tended to explain why J and L would have been afraid of the defendant and, in turn, delayed their disclosure of the defendant's sexual abuse.

Moreover, the evidence in the threatening and disorderly conduct cases was more probative than prejudicial in the sexual assault cases, and, although the trial court improperly applied the *Boscarino* undue prejudice analysis, which applies only when the trial court has determined that the evidence in one case would be irrelevant in the other case or cases, rather than the ordinary more prejudicial than probative evidentiary analysis in determining whether the evidence was cross admissible, that error was harmless insofar as those analyses are substantially similar.

The trial court reasonably determined that the defendant would not be unduly prejudiced by the admission of the evidence in the threatening and disorderly conduct cases in the sexual assault cases, especially given the shocking and brutal nature of the sexual assault charges, and this court rejected the defendant's contention that he was substantially prejudiced by joinder insofar as he was represented by different attorneys with respect to the sexual assault cases and the threatening and disorderly conduct cases, the ten count information made it more likely that the jury would draw negative conclusions about the defendant and his guilt, and joinder made it more likely that a witness would disclose that he previously had been incarcerated, in violation of the trial court's ruling prohibiting the admission of such evidence.

d. The trial court did not abuse its discretion in determining that evidence of the conduct that gave rise to the charges in the sexual assault cases was cross admissible in the threatening and disorderly conduct cases:

With respect to the threatening charge, the evidence pertaining to the charges in the sexual assault cases was relevant to whether the defendant intended to terrorize other persons when he threatened to decapitate S, D, and other family members because, without knowing whether S's accusation that the defendant was a "pedophile son of a bitch" had any basis in fact, the jury would have been unable to determine whether his enraged response was a drunken expression of momentary indignation and outrage at being falsely accused or, instead, revealed his consciousness of guilt and an intent to terrorize the targets of, and those who heard, the threats to keep them from reporting the sexual abuse to the police, and it was also relevant to whether the targets of the threats and others would interpret them as a genuine threat of violence or, instead, as drunken bluster.

State *v.* James A.

With respect to the disorderly conduct charge, the evidence pertaining to the charges in the sexual assault cases was relevant to whether the defendant was aware of and consciously disregarded the risk that he would cause inconvenience, annoyance, or alarm when he went to A's house to confront A's family and threw a can of beer and charged at M, and whether that conduct was genuinely threatening.

Moreover, although the sexual assault cases involved conduct that was more brutal and shocking than that involved in the threatening and disorderly conduct cases, the disparity between the cases was not so great that the evidence relating to the sexual assault cases was more prejudicial than probative in the threatening and disorderly conduct cases, especially given the trial court's finding that the cases were interwoven and the highly probative nature of the evidence.

Furthermore, even if the evidence relating to the sexual assault cases was inadmissible in the threatening and disorderly conduct cases because it was more prejudicial than probative, the joinder of the cases was harmless in view of the record, as the defendant failed to establish that the joinder substantially affected the verdict.

2. This court declined to review the defendant's claim that the trial court improperly had denied his request to testify about the nonsexual nature of his prior felony convictions without being subject to cross-examination about the specific nature of those convictions, the record having been inadequate for review of that claim:

Nothing in the record indicated the reason for the defendant's ultimate decision not to testify, and it was possible that he would have decided not to testify, even if the trial court had barred the prosecutor from asking the defendant on cross-examination about the specific nature of his prior convictions.

Moreover, nothing in the record indicated whether the defendant intended to testify only that his prior convictions were of a nonsexual nature or, instead, that he intended to testify concerning the lack of guilt on the charges he was facing, and, without knowing what the defendant intended to testify about, this court could not determine whether the testimony that the prosecutor intended to elicit on cross-examination would have been relevant to the defendant's veracity.

(*Two justices concurring separately and one justice
concurring in part separately*)

Argued March 25—officially released December 19, 2022*

* December 19, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

State *v.* James A.

*Procedural History*

Two part substitute information, in four consolidated cases, charging the defendant, in the first part, with three counts each of the crimes of sexual assault in the first degree and risk of injury to a child, and with one count each of the crimes of sexual assault in the second degree, strangulation in the first degree, threatening in the second degree and disorderly conduct, and, in the second part, with being a persistent dangerous felony offender, brought to the Superior Court in the judicial district of Waterbury, where the first part of the information was tried to the jury before *Klatt, J.*; verdicts of guilty; thereafter, the defendant was presented to the court, *Klatt, J.*, on a plea of guilty to the second part of the information; judgments of guilty in accordance with the verdicts and plea, from which the defendant appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Amy L. Sedensky* and *Don E. Therkildsen, Jr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KELLER, J. The primary issue before us in this appeal is whether the trial court properly joined for trial, pursuant to Practice Book § 41-19,[1] sexual assault, risk of injury to a child, and strangulation charges with threatening and disorderly conduct charges. The defendant,

[1] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

State *v.* James A.

James A., appeals[2] from the judgments of conviction, rendered after a jury trial, of one count of threatening in the second degree in violation of General Statutes § 53a-62 (a) (2) (A), three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1), three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2), one count of strangulation in the first degree in violation of General Statutes § 53a-64aa (a) (1) (B), and one count of disorderly conduct in violation of General Statutes § 53a-182 (a) (1). On appeal, the defendant claims that the trial court abused its discretion when it (1) joined for trial his sexual assault, risk of injury to a child, and strangulation charges with his threatening and disorderly conduct charges, and (2) denied his request, as a remedy for the disclosure of his prior incarceration by one of the state's witnesses, that he be allowed to testify about the nonsexual nature of his prior felony convictions without opening the door to being asked on cross-examination about the nature of those convictions. We reject the defendant's claims and, accordingly, affirm the judgments of the trial court.

The jury reasonably could have found the following facts. The defendant began a relationship with D sometime around 2011. D was the mother of S, who was born in 1996, J, who was born in 2003, L, who was born in 2006, and V, who was born in 2016. In 2014, the defendant, D, J, and L moved into a basement apartment in Naugatuck. The apartment was small, and they shared it with D's brother, his girlfriend, and their three children. The five children shared one bedroom. J testified that the first time the defendant sexually assaulted her was in this apartment during the summer before she

---

[2] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

State *v.* James A.

entered the sixth grade. While the adults were outside smoking and the other children were in a different room, the defendant came into the room where J was reading to kiss her goodnight. He then took down her blanket, pulled down her pajama pants and underwear, and put his tongue in her vagina.

Later that year, the defendant purchased a five bedroom home in Naugatuck, into which he moved with D, S, J, L, and D's father, M. J testified about three incidents of sexual abuse that occurred at the Naugatuck home. During the first incident, J was watching a movie with L and the defendant, when he asked her to come lie down with him. At this point, J's buttocks were against the defendant's penis. The defendant put a blanket over J and himself and then put his hand in J's pants and inserted his finger into her vagina. J testified that she felt the defendant's penis become erect during the incident. J asked the defendant to stop in a whispered tone so that L, who was also on the couch, would not see or hear what was happening.

During the second incident, the defendant and J were sitting in the dining room of the house. The defendant pulled J onto him and started kissing her neck. When J stood up, the defendant stood up as well, slid his hand into her underwear, and digitally penetrated her vagina while holding her arms down and grabbing her chest. After a couple of minutes passed, J pushed the defendant off and ran to a nearby cul-de-sac to meet a friend. Several hours later, J returned home, and the defendant apologized. He also told J not to tell D what had happened "because he bought the house for [them] and . . . fed [them] and . . . made [her] mom happy." J did not tell D what had happened because she was afraid of the defendant.

During the third incident, the defendant entered J's room while she was video chatting with a friend on her

State *v.* James A.

computer. The defendant pulled down J's pants and licked her anus. J stopped her conversation and flipped her computer upward to prevent her friend from seeing what the defendant was doing. After the defendant left the room, J locked her door and did not mention the incident to her friend. At some point, J disclosed to S the sexual abuse by the defendant.

In addition to the sexual abuse, J also testified that the defendant had strangled her to the point of unconsciousness on multiple occasions. On one occasion, the defendant, without warning, started choking her with L present in the room. When L noticed that J could not breathe, L jumped on the defendant's back, but J still lost consciousness temporarily. When J regained consciousness, the defendant shook her and said: "[D]on't tell your mom. It was an accident. I didn't know you were going to pass out."

The defendant also sexually assaulted L. On one occasion, when L was in the fourth or fifth grade, the defendant entered her bedroom where she was playing with dolls. He attempted to close the door but was unable to do so because its hinge was broken. The defendant then pulled L's pants and underwear down to her knees and put his tongue on her vagina. At this point, D entered the room, saw the defendant with his face near L's naked buttocks, and began to hit and scream at the defendant. It appeared to D that the defendant was "blowing farts" in L's buttocks. L testified that she knew the defendant's actions were "inappropriate," but she "was scared of him."

On August 4, 2018, the defendant and D were married and hosted a wedding after-party at the Naugatuck home. Shortly after midnight, the defendant and D had an altercation. S, upset by the altercation, approached the defendant, accused him of touching J inappropriately, and called him a "pedophile son of a bitch." S

State *v.* James A.

testified that the defendant responded to her comment with "[e]xtreme anger and extreme violence." The defendant charged at S after stating: "If any charges are brought against me, I will cut your fucking head off . . . ." (Internal quotation marks omitted.) The defendant also threatened S's father, A, D's sister, K, M, and D. While making these threats, the defendant grappled with A, who had stepped in to protect S from the defendant, smashed several framed pictures that were on the wall in the corridor next to his bedroom, and punched a hole in the wall. The defendant also flipped over a heavy wooden dining room table, shattering the glasses that had been on it and the chandelier hanging above it. While engaged in this conduct, the defendant screamed at the wedding guests, who were still present in the house, to "[g]et the fuck" out. (Internal quotation marks omitted.) J, who was in her bedroom with a friend, heard S and the defendant screaming and the flipping of the table. The ruckus was so loud that it was heard by neighbors, who reported it to the police.

Immediately after the defendant made the threats against S and the others, S rushed to J's bedroom and informed her that she had told the defendant about J's disclosures of sexual abuse. In response, J was "terrified, hysterical [and] crying," and stated, "[h]e's going to kill me. I told on him." (Internal quotation marks omitted.) At some point, both J and L left the house and were brought to A's van. As J approached the van, she saw the defendant, panicked, and ran back to her bedroom, where she hid in a closet. Her uncles found her there and brought her to the van a second time. At that point, the defendant, who had been "yelling at people" in the driveway, ordered L to get out of the van. She refused.

The police eventually arrived in response to the noise complaint and spoke to several people, including M, who told them that the defendant ran off into the woods

State *v.* James A.

when they arrived. After a short time, the police left, and A, K, J, L, and S left in the van and went to A's house.

S, J, and L remained at A's house the day after the wedding. M, D, and V arrived at some point, and J told D at that time about the defendant's sexual abuse of her. A notified the Naugatuck police about the sexual abuse allegations, and they came to the house to investigate. The police then made unsuccessful attempts to locate the defendant. Believing that the defendant would come to the house to carry out his threats, the adults there made a plan that M and A would arm themselves and stay outside, and, if the defendant showed up, they would give a signal, and S, D, and K would "grab the children and . . . go into the basement."

At approximately 11 p.m., A observed a car slowly drive down his secluded, dead-end street and stop in the middle of the road. A walked down the driveway to investigate, and the car then began to move toward the dead end and turned around. As A walked back up the driveway, he saw the defendant emerge from behind a bush, walk onto the front porch of the house, and peer into the living room, where J, L, and V were sleeping on the couch. A drew a handgun and stated, "James is that you?" (Internal quotation marks omitted.) This caused M to walk toward the front of the house. The defendant acknowledged his identity, and A ordered him to leave and shouted the secret word to trigger everyone inside the house to get to the basement and to call the police. The children were "hysterical" and "crying," and cowered under a utility sink while covering their ears. J called the police.

Meanwhile, A told the defendant that the police were looking for him, and he responded, "I know. For what?" (Internal quotation marks omitted.) The defendant further stated that he was not going to leave. At that point, both A and M had their guns pointed at the defendant,

State *v.* James A.

and A told the defendant, "[y]ou got another gun on you, so just get down," and said that the police were on their way. (Internal quotation marks omitted.) The defendant then began to act "crazy." He looked at M and said, "How did I do 'em? Did I do 'em like this?" while "humping the air." (Internal quotation marks omitted.) He then threw an open beer can that he was holding at M and charged at him. M shot the defendant once when the defendant was four to six feet away from him. M then walked up the driveway, placed the gun on the top of a car, and waited for the police to arrive, knowing that they had already been called. The Naugatuck and Prospect police arrived at the scene shortly thereafter.[3] At that point, everyone at the house was "extremely relieved that [they] were safe [and] that [they] knew where [the defendant] was [and] . . . that he couldn't come and try to hurt [them]."

The state subsequently charged the defendant with disorderly conduct in connection with the altercation with A and M on the day after the wedding. The state also charged the defendant in a separate information with threatening in the second degree in connection with his conduct at the after-party at the Naugatuck house. With respect to his conduct toward J and L, the state charged the defendant, in two separate informations, with three counts of sexual assault in the first degree, one count of sexual assault in the second degree, three counts of risk of injury to a child, and one count of strangulation in the first degree.

Prior to trial, the state moved to consolidate the four cases for trial, and the defendant responded by filing a motion to sever. The defendant did not object to the

_____

[3] After an investigation, the Naugatuck police determined that M's shooting of the defendant was justified because the defendant had been the "primary aggressor" during the altercation. Accordingly, the state did not prosecute M for the shooting.

State *v.* James A.

consolidation of the sexual assault cases[4] involving J and L but argued that the threatening and disorderly conduct cases should be severed and tried separately from the sexual assault cases. The trial court granted the state's motion to consolidate and denied the defendant's motion to sever, determining that the state had met its burden of establishing by a preponderance of the evidence that the evidence in the sexual assault cases and the threatening and disorderly conduct cases was cross admissible. The trial court also determined that, under *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987), joinder would not be unduly prejudicial to the defendant.[5]

The cases were tried to a jury. During its jury charge, the trial court instructed the jury to consider each of the ten charged counts separately during its deliberations.[6]

[4] In the interest of simplicity, we refer to the cases related to the sexual assault, risk of injury to a child, and strangulation charges as the sexual assault cases.

[5] In *State* v. *Boscarino*, supra, 204 Conn. 722–24, this court "identified several factors that a trial court should consider in deciding whether a severance [or denial of joinder] may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 156, 51 A.3d 1048 (2012).

[6] The trial court instructed the jury: "Now, the defendant is charged with ten separate counts in a long form information. The defendant is entitled to and must be given, by you, a separate and independent determination of whether he is guilty or not guilty as to each of the counts—each of the counts charged as a separate crime.

"The state is required to prove each element in each count beyond a reasonable doubt. Each count must be deliberated upon separately. The total number of counts charged does not add strength to the state's case. You may find that some evidence applies to more than one count in the information.

"The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity. This includes a separate

State *v.* James A.

The jury found the defendant guilty on all counts. Thereafter, the defendant pleaded guilty to a part B information charging him with being a persistent dangerous felony offender, and the trial court imposed a total effective sentence of fifty years of incarceration, execution suspended after thirty-five years, followed by twenty years of probation.[7] This direct appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the trial court abused its discretion when it (1) joined the sexual assault cases with the threatening and disorderly conduct cases for trial, and (2) denied the defendant's request for permission to testify that his prior felony convictions were nonsexual in nature, without being subject to cross-examination by the state as to the nature of those prior convictions, as a remedy for the

consideration as to the charges related to each victim and the evidence pertaining to each victim. You must consider each count separately and return a separate verdict for each count. A decision on one count does not bind your decision on another count. This means you may reach opposite verdicts on different counts.''

[7] The trial court imposed the following concurrent sentences of imprisonment with respect to each count: On count one, threatening in the second degree, the court imposed a sentence of one year; on count two, sexual assault in the first degree, the court imposed a sentence of fifty years, execution suspended after thirty-five years; on count three, risk of injury to a child, the court imposed a sentence of twenty years; on count four, sexual assault in the first degree, the court imposed a sentence of fifty years, execution suspended after thirty-five years; on count five, sexual assault in the second degree, the court imposed a sentence of twenty years; on count six, risk of injury to a child, the court imposed a sentence of twenty years; on count seven, strangulation in the first degree, the court imposed a sentence of ten years; on count eight, sexual assault in the first degree, the court imposed a sentence of fifty years, execution suspended after thirty-five years; on count nine, risk of injury to a child, the court imposed a sentence of twenty years; and, on count ten, disorderly conduct, the court imposed a sentence of ninety days. In addition to imprisonment, the trial court also imposed a twenty year probationary period and ordered the defendant to register as a sex offender, to comply with protective orders that it issued for the benefit of the victims, and to pay sexual assault victims account fines totaling $1057.

State *v.* James A.

inadvertent disclosure of the defendant's prior incarceration by a state's witness. We address each claim in turn.

I

We begin with the defendant's claim that the trial court abused its discretion when it joined the sexual assault cases and the threatening and disorderly conduct cases for trial. The defendant contends that, for evidence to be cross admissible for purposes of our joinder jurisprudence, *all* evidence from each case must be fully admissible in every other case. The defendant also contends that, under *State* v. *Boscarino*, supra, 204 Conn. 722–24; see footnote 5 of this opinion; he was substantially prejudiced by the joinder as a result of (1) the shocking and brutal nature of the sexual assault charges, (2) issues concerning trial strategy and jury selection occasioned by his having a public defender representing him with respect to the sexual assault cases and private counsel representing him with respect to the threatening and disorderly conduct cases, (3) the adverse effect that having to consider and deliberate on a ten count information may have had on the jury, and (4) the increased chance that the multiplicity of witnesses in the consolidated cases would result in the inadvertent disclosure of his felony record, which indeed happened during M's testimony.

In response, the state contends that the trial court did not abuse its discretion in determining that the evidence underlying the sexual assault cases and the threatening and disorderly conduct cases was cross admissible because the defendant's threats and conduct in response to the accusation of sexual abuse were relevant and probative to establish his consciousness of guilt with respect to the sexual assault charges, and the evidence of the sexual assaults established a motive for his threats and disorderly conduct. The state also contends, in the alternative, that none of the *Boscarino*

State *v.* James A.

factors is present here because each case involved discrete, easily distinguishable factual scenarios, and none of the cases was so shocking and brutal that any prejudice could not be cured by the court's instructions to the jury. Finally, the state contends that, even if the trial court abused its discretion in joining the cases, any error was harmless because it did not substantially sway the jury's verdict. We conclude that the trial court properly joined the cases.

We begin with a review of the governing legal principles. "[The] General Statutes and rules of practice expressly authorize a trial court to order a defendant to be tried jointly on charges arising from separate cases." (Internal quotation marks omitted.) *State* v. *Rivera*, 260 Conn. 486, 490, 798 A.2d 958 (2002); see General Statutes § 54-57; Practice Book § 41-19. "[I]n *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012), and *State* v. *Payne*, 303 Conn. 538, 544–50, 34 A.3d 370 (2012) . . . we rejected the notion of a blanket presumption in favor of joinder and clarified that, when charges are brought in separate informations, and the state seeks to join those informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. [See footnote 1 of this opinion.] The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible *or* that the defendant will not be unfairly prejudiced pursuant to the factors set forth in *State* v. *Boscarino*, [supra, 204 Conn. 722–24] . . . . Although the state bears the burden of proof in the trial court, [i]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . As we emphasized in *LaFleur*, our appellate standard of review remains intact. Accordingly, [i]n deciding whether to [join infor-

State *v.* James A.

mations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb.''[8] (Citations omitted; emphasis added; footnotes omitted; internal quotation marks omitted.) *State* v. *Devon D.*, 321 Conn. 656, 664–65, 138 A.3d 849 (2016).

''A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, [when] evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper [when] the evidence of other crimes or uncharged misconduct [was] cross admissible at separate trials. . . . [When] evidence is cross admissible, therefore, our inquiry ends.'' (Citations omitted; internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 155; see *Leconte* v. *Commissioner of Correction*, 207 Conn. App. 306, 327, 262 A.3d 140 (''[I]t is well established that [when] the evidence in one case is cross admissible at the trial of another case, the defendant will not be substantially prejudiced by joinder. . . . Our case law is clear that a court considering joinder need not apply the *Boscarino* factors if evidence in the cases is cross admissible.'' (Internal quotation marks omitted.)), cert. denied, 340 Conn. 902, 263 A.3d 387 (2021). To be cross admissible, the evidence must be both relevant and more probative than prejudicial. See Conn. Code Evid. § 4-3 (''[r]elevant evidence may

[8] The discretion accorded to the trial court is, of course, bounded by the need to safeguard the defendant's right to a fair trial. See *State* v. *LaFleur*, supra, 307 Conn. 155. Trial courts must remain highly sensitive to the risk of prejudice flowing from improper joinder.

State *v.* James A.

be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence''); see also *State* v. *Campbell*, 328 Conn. 444, 522, 180 A.3d 882 (2018) (''[f]or prior misconduct evidence to be admissible, it must not only be relevant and material, but also more probative than prejudicial'').

Before addressing the merits of the defendant's claim, we address his claim that, under the foregoing principles, full cross admissibility for joinder purposes means that every intimate detail necessary to prosecute each charge must be admissible in each case. He asks us to ''reject any suggestion that partial or unidirectional admissibility is sufficient to join cases'' because, in such a circumstance, separate trials would provide a significant benefit to the defendant. See *State* v. *LaFleur*, supra, 307 Conn. 155 (''[when] evidence of one incident would be admissible at the trial of the other incident, separate trials could provide the defendant no significant benefit'' (internal quotation marks omitted)). The defendant contends that the cases should not be joined if (1) evidence in one case is admissible in the other case only for a limited purpose, or (2) the evidence presented at one of the trials would not be fully admissible at another. We disagree. With respect to the defendant's first contention, our case law establishes that the fact that evidence that may be admitted only for a limited purpose in one of the cases to be joined does not defeat a finding of cross admissibility for purposes of joinder. See, e.g., *State* v. *Crenshaw*, 313 Conn. 69, 86–88, 95 A.3d 1113 (2014) (establishing cross admissibility by concluding that evidence of assault and first degree kidnapping charges in first case would be admissible as to murder charge in second case to establish intent and that evidence of murder and second degree

State *v.* James A.

kidnapping charges in second case would be admissible as to first degree kidnapping charge in first case to establish motive and intent).

With respect to the defendant's contention that the evidence in both cases must be fully cross admissible before the cases may be joined, that contention is inconsistent with our well established jurisprudence holding that the state must prove "either that the evidence in the cases is cross admissible *or* that the defendant will not be unfairly prejudiced [by joinder] pursuant to the [*Boscarino*] factors . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Devon D.*, supra, 321 Conn. 664–65. The defendant's proposed standard also conflicts with the principle that, "in making the discretionary, pretrial decision to join multiple cases, [the trial court] rules on whether the evidence *could* be admissible, not whether the evidence actually *is* admitted." (Emphasis in original.) *State* v. *Crenshaw*, supra, 313 Conn. 89. "Because the decision to join two cases occurs prior to the introduction of evidence, the trial court must make its decision on the basis of potential admissibility rather than what actually transpires at trial. It would not make sense for a reviewing court to overturn the trial court's discretionary, pretrial decision to consolidate solely on the ground that the parties did not ultimately introduce the evidence at trial." Id. Thus, under *Crenshaw*, cases may be joined for trial, even if it is possible that *no* cross admissible evidence will actually be admitted. Indeed, requiring the state to establish full, bilateral and actual cross admissibility would defeat the benefits of judicial economy and context for the trier that are afforded by joinder.

Having rejected the defendant's claim related to the proper standard for joinder, we turn to the questions of whether the evidence in the threatening and disorderly conduct cases was admissible in the sexual assault cases, and vice versa. We begin with the question of

State *v.* James A.

whether the evidence in the threatening and disorderly conduct cases was admissible in the sexual assault cases. Although evidence of other crimes is generally "inadmissible to prove the bad character, propensity, or criminal tendencies" of the defendant; Conn. Code Evid. § 4-5 (a); it is admissible for nonpropensity purposes, "such as to show *intent*, an element [of] the crime, identity, malice, *motive* or a system of criminal activity," if its probative value outweighs its prejudicial effect. (Emphasis added; internal quotation marks omitted.) *State* v. *Anderson*, 318 Conn. 680, 693, 122 A.3d 254 (2015); see also Conn. Code Evid. § 4-5 (c); *State* v. *James G.*, 268 Conn. 382, 390, 844 A.2d 810 (2004) ("[s]uch evidence is admissible if: (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions; and (2) its probative value outweighs its prejudicial effect"). We conclude that the trial court reasonably could have concluded that the defendant's violent reaction to the accusation of sexual abuse, which underlay the threatening and disorderly conduct charges, tended to establish that he was intent on preventing the victims from disclosing the allegations of sexual abuse to the authorities. In turn, this intent showed consciousness of guilt and tended to make it more probable that he committed the sexual abuse. See *State* v. *Walker*, 214 Conn. 122, 129, 571 A.2d 686 (1990) ("evidence of threats against witnesses is generally admissible either on the theory that such conduct is inconsistent with the defendant's claim of innocence or on the theory that the making of such threats evinces a consciousness of guilt"); see also *State* v. *Edwards*, 325 Conn. 97, 141, 156 A.3d 506 (2017) ("[i]t is well established that '[i]n a criminal trial, it is relevant to show the conduct of an accused, as well as *any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act*' " (emphasis added)).

State *v.* James A.

We also agree with the state's argument that the defendant's violent reaction to the accusation would be relevant to explain why J and L would have been afraid of the defendant and, in turn, their delayed disclosure of the defendant's sexual abuse to D and the authorities. See, e.g., *State* v. *Daniel M.*, 210 Conn. App. 819, 825, 271 A.3d 719 (evidence of domestic violence witnessed by sexual assault victim was probative of her credibility because it provided explanation for delayed disclosure), cert. denied, 343 Conn. 906, 273 A.3d 234 (2022). We conclude, therefore, that the evidence in the threatening and disorderly conduct cases also was relevant in the sexual assault cases.[9]

We also conclude that the evidence in the threatening and disorderly conduct cases was more probative than prejudicial in the sexual assault cases. See, e.g., *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013) ("evidence is admissible to prove consciousness of guilt if, first, it is relevant, and second, its probative value outweighs its prejudicial effect"); see also *State* v. *James G.*, supra, 268 Conn. 395 ("a reviewing court must be able to infer from the entire record that the trial court considered the prejudicial effect of the evidence against its probative nature before making a ruling" (emphasis omitted; internal quotation marks omitted)). "[T]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 322–23, 253 A.3d 458 (2020).

---

[9] See *State* v. *Bermudez*, 341 Conn. 233, 249, 267 A.3d 44 (2021) ("Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities [or be conclusive] . . . ." (Internal quotation marks omitted.)).

State *v.* James A.

Before addressing the merits of the defendant's claim that he was prejudiced by the joinder of the cases, because there appears to be some confusion on this issue, we take this opportunity to clarify the procedures for a trial court's determination of whether joinder is proper. To make this determination, the trial court must first consider whether, "in the event of separate trials, evidence relating to each of the cases would have been admissible in the other.'' *State* v. *Greene*, 209 Conn. 458, 464, 551 A.2d 1231 (1988). Thus, the court must consider (1) whether the evidence in each of the cases is relevant in the other case, and (2) if the evidence is relevant, whether admission of the evidence relating to each of the cases would be more probative than prejudicial in the other case. See Conn. Code Evid. § 4-3 (relevant evidence may be excluded if its probative value is outweighed by its prejudicial effect). If the court determines that the evidence in each case is relevant in the other case and its admission would be more probative than prejudicial, the evidence is cross admissible, and the cases may be joined. See *State* v. *LaFleur*, supra, 307 Conn. 155 ("[when] evidence is cross admissible . . . our inquiry ends"); *Leconte* v. *Commissioner of Correction*, supra, 207 Conn. App. 327 ("[o]ur case law is clear that a court considering joinder need not apply the *Boscarino* factors if evidence in the cases is cross admissible" (internal quotation marks omitted)). If the evidence in one case is relevant to the other case, but its admission would be more prejudicial than probative, then the evidence is not cross admissible and the cases may not be joined. There is no need for the trial court to determine whether joinder would be prejudicial under *Boscarino* because the court has already determined that admission of the evidence would be prejudicial under ordinary evidentiary principles. If the court determines that the evidence in one case is not relevant in the other case, then the trial court must determine

State *v.* James A.

whether joinder of the cases would be prejudicial by applying the *Boscarino f*actors. Thus, it is only when the trial court has determined that the evidence in one case would be *irrelevant* in the other case that *Boscarino* comes into play.

In the present case, the trial court determined that, although the evidence in the threatening and disorderly cases showed that the defendant had engaged in violent conduct, the conduct was not so brutal and shocking that it would unduly prejudice the defendant.[10] Specifically, the court determined that the evidence in the threatening and disorderly conduct cases was relevant in the sexual assault cases and then determined that admission of the evidence in the sexual assault cases would not be unduly prejudicial under *Boscarino*. As we explained, the court should have applied the ordinary "more prejudicial than probative" evidentiary analysis to determine whether the evidence was cross admissible, not the *Boscarino* undue prejudice analysis. Because those analyses are substantially similar, however, we conclude that this error was harmless. Compare Conn. Code Evid. § 4-3 ("[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice or surprise, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence") with *State* v. *Boscarino*, supra, 204 Conn. 722–24 (to determine whether joinder of cases

_____

[10] The trial court stated that it would not be prejudicial to try the disorderly conduct and threatening cases with the sexual assault cases because "they're obviously separate charges, they have separate elements, [and] they're easily distinguishable factual scenarios for a jury. While [the threatening and disorderly conduct cases] involve violence, it's not to the extent [that] it's brutal or shocking violence on the defendant's part. In fact, [the defendant] seems to have been the victim of the most serious violence [i.e., the gunshot wound inflicted by M], setting aside the sex assault charges. It certainly wouldn't add to the length of the trial as I indicated; it appears from argument from both parties this is all interwoven with each other.

State *v.* James A.

in which evidence is not cross admissible would cause undue prejudice, trial court must consider (1) whether charges involve discrete, easily distinguishable factual scenarios, (2) whether crimes were of violent nature or concerned brutal or shocking conduct on defendant's part, and (3) duration and complexity of trial). We further conclude that the trial court's conclusion that the defendant would not be prejudiced by the admission of the evidence in the threatening and disorderly conduct cases in the sexual assault cases was reasonable. This is especially so given the shocking and brutal nature of the sexual assault charges. Cf. *State* v. *Dillard*, 132 Conn. App. 414, 426, 31 A.3d 880 (2011) ("[t]his court consistently has declined to conclude that the admission of evidence was unduly prejudicial when the prior acts of misconduct were substantially less shocking than the crimes charged"), cert. denied, 303 Conn. 932, 36 A.3d 694 (2012).

The defendant also contends that he was prejudiced by the joinder because he was represented by different attorneys with respect to the sexual assault cases and the threatening and disorderly conduct cases, and joining the cases deprived them of their "ability to each make tactical decisions about jury selection, cross-examination, and argument that would benefit [the defendant] in the [cases] each was retained for." The trial court rejected this contention, concluding that each attorney would be required to take into account the existence of the cases in which he was not representing the defendant when making tactical decisions, regardless of whether the cases were joined. We agree with the trial court and, therefore, reject the defendant's contention.

The defendant further contends that, even if the substance of the evidence in the threatening and disorderly conduct cases was not unduly prejudicial, the ten count information by itself made it more likely that the jury

State *v.* James A.

would draw negative conclusions about the defendant and his guilt. We disagree. Without the misdemeanor threatening and disorderly conduct charges, the charges in the sexual assault cases accounted for eight of the ten counts of the information. Further, the trial court instructed the jury that the evidence must be considered separately as to each element in each count and that each count was a separate entity requiring separate consideration.

Finally, the defendant contends that he was prejudiced by the joinder of the threatening and disorderly conduct cases with the sexual assault cases because joinder made it more likely that a witness would disclose that he previously had been incarcerated in violation of the trial court's ruling prohibiting the admission of such evidence, which actually occurred during M's testimony.[11] Again, we disagree. In the absence of strong evidence to the contrary, we cannot conclude that the trial court must foresee that a witness will, either intentionally or inadvertently, violate the court's rulings on the admissibility of evidence when determining whether joinder is appropriate. Accordingly, we conclude that the trial court did not abuse its discretion in determining that evidence of the conduct that gave rise to the charges in the threatening and disorderly conduct cases would be admissible in the sexual assault cases.

The question remains whether the trial court correctly determined that evidence of the conduct that gave rise to the charges in the sexual assault cases was cross admissible in the threatening and disorderly conduct cases. The state contends that evidence that the defendant sexually assaulted J and L established the requisite intent in the threatening case, namely, that the defendant threatened to commit a "crime of vio-

_____

[11] We discuss these facts and procedural history more fully in part II of this opinion.

State *v.* James A.

lence with the intent to terrorize another person . . . .''
General Statutes § 53a-62 (a) (2) (A). Specifically, the
state contends that the evidence would tend to establish
the defendant's motivation for making threats and to
rebut any claim that the defendant was engaged in
"mere puffery." The state further contends that evi-
dence in the sexual assault cases was relevant to estab-
lish the elements of disorderly conduct pursuant to
§ 53a-182 (a) (1) because it explained why M and A
were patrolling outside A's house and why the defen-
dant went there, which, in turn, tended to show that
the defendant's violent and tumultuous conduct was
intended to cause inconvenience, annoyance, or alarm.
We agree with the state.

Understanding the elements of the crimes of threaten-
ing in the second degree and disorderly conduct is
essential to determining whether the evidence in the
sexual assault cases was admissible to prove the charges
in the threatening and disorderly conduct cases. To
prove that a defendant is guilty of threatening in the
second degree, the state is required to establish beyond
a reasonable doubt that the defendant "threaten[ed] to
commit any crime of violence with the intent to terrorize
another person . . . ." General Statutes § 53a-62 (a)
(2) (A). To meet this standard, "the state [is] required
to present evidence demonstrating that a reasonable
listener, familiar with the entire factual context of the
defendant's statements, would be highly likely to inter-
pret them as communicating a genuine threat of vio-
lence . . . ." (Internal quotation marks omitted.) *State*
v. *Pelella*, 327 Conn. 1, 18, 170 A.3d 647 (2017). This
"factual context" includes the specific language used
by the defendant, the parties' prior relationship, and the
immediate circumstances surrounding the defendant's
statement. See id., 20–21. Whether the speaker had a
history of making threats toward the person threatened
or had a history of abusing the victim also is relevant

State *v.* James A.

to the determination as to how the victim would interpret the speech. See *State* v. *Krijger*, 313 Conn. 434, 457, 97 A.3d 946 (2014) (citing cases).

For purposes of § 53a-62 (a) (2) (A), a threat "need not be unconditional . . . . [Rather] a threat may still be a true threat even if it is presented in conditional terms such that the listener can escape from physical violence by fulfilling certain demands or directives." (Citation omitted.) *State* v. *Pelella*, 327 Conn. 16 n.15. In addition, the threat of violence need not be directed at the same person that the defendant intends to terrorize. For example, the statement, "if *you* report me to the police, I'll kill *your family*," may be encompassed by the statute. (Emphasis added; internal quotation marks omitted.) Id., 16.

With respect to the crime of disorderly conduct, § 53a-182 provides in relevant part: "(a) A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior . . . ." Thus, "the crime of disorderly conduct consists of two elements: (1) that the defendant intended to cause, or recklessly created a risk of causing, inconvenience, annoyance or alarm and (2) that he did so by engaging in fighting or in violent, tumultuous or threatening behavior . . . ." (Internal quotation marks omitted.) *State* v. *Parnoff*, 160 Conn. App. 270, 276, 125 A.3d 573 (2015), aff'd, 329 Conn. 386, 186 A.3d 640 (2018). In the present case, the defendant was charged with recklessly creating a risk of causing inconvenience, annoyance, or alarm by engaging in a prohibited form of conduct.

With this background in mind, we turn to the question of whether the evidence pertaining to the charges in the sexual assault cases was admissible to prove the

State *v.* James A.

threatening and disorderly conduct charges. We conclude that it was. With respect to the threatening charge, the evidence was relevant to the question of whether the defendant intended to terrorize other persons when he threatened to decapitate S, M, A, D, and K. Without knowing whether S's accusation that the defendant was a "pedophile son of a bitch" had any basis in fact, the jury would be unable to determine whether his enraged response was a drunken expression of momentary indignation and outrage at being falsely accused or, instead, revealed consciousness of guilt and an intent to terrorize the targets of the threats—and others who heard or later learned of them, including J and L—to keep them from reporting the sexual abuse to the police. The evidence was also relevant to the question of whether the persons at whom the threats were directed and others would interpret them as a genuine threat of violence or, instead, as drunken bluster. See, e.g., *State* v. *Pelella*, supra, 327 Conn. 18 (jury should consider "the *entire* factual context of the defendant's [threatening] statements" (emphasis added; internal quotation marks omitted)); id. (to find defendant guilty of threatening, jury must find "that a reasonable listener . . . would be highly likely to interpret [the defendant's speech] as communicating a genuine threat of violence" (internal quotation marks omitted)); see also *State* v. *Krijger*, supra, 313 Conn. 457 (whether speaker had history of abusing victim is relevant to determination as to how victim would interpret threatening speech). Similarly, with respect to the disorderly conduct charge, the evidence was relevant to whether the defendant was aware of and consciously disregarded the risk that he would cause inconvenience, annoyance, or alarm when he went to A's house on the day after the wedding to confront his family and threw a can of beer at and charged M, and whether that conduct was genuinely threatening. See, e.g., *State* v. *Parnoff*, supra, 160 Conn.

State *v.* James A.

App. 276 (to establish disorderly conduct, state must
prove ''(1) that the defendant intended to cause, or
recklessly created a risk of causing, inconvenience,
annoyance or alarm and (2) that he did so by engaging
in fighting or in violent, tumultuous or threatening
behavior'' (internal quotation marks omitted)). Indeed,
it is difficult to imagine how the threatening and disor-
derly conduct charges could be tried *without* introduc-
ing any evidence related to the sexual assault cases.

We also conclude that the trial court did not abuse
its discretion in finding that the probative value of the
evidence related to the sexual assault cases outweighed
any prejudicial effect in the threatening and disorderly
conduct cases.[12] The evidence underlying the threaten-
ing and disorderly conduct charges established that the
defendant, on his wedding night, threatened to decapi-
tate S, K, A, M, and his new wife, D; smashed framed
pictures; punched a hole in the wall; overturned a heavy
wooden table, shattering glasses and a chandelier in
the process; and screamed at his guests to ''[g]et the
fuck'' out of his house. The next day, knowing that the
police were looking for him in connection with the
accusations of sexual abuse, the defendant approached
A's house at night; crept onto the front porch and peered
into the living room where J, L, and V were sleeping;
taunted M by miming sexual acts with J and L; and
threw an open can of beer at M and charged at him.

[12] Although the trial court made no express finding to this effect, such a
finding is implicit in the trial court's determination that joinder was appro-
priate, despite the fact that the sexual assault cases involved ''the most
serious violence,'' because the cases were ''all interwoven with each other.''
See footnote 10 of this opinion (noting that trial court found that defendant
was victim of ''the most serious violence . . . *setting aside the sex assault
charges*'' (emphasis added)). Indeed, we must presume that the trial court
applied the proper standard for joinder. See, e.g., *DeNunzio* v. *DeNunzio*,
320 Conn. 178, 197, 128 A.3d 901 (2016) (''[w]hen examining an ambiguous
decision . . . we presume that the trial court applied the correct standard''
(internal quotation marks omitted)).

State *v.* James A.

By the defendant's own admission, this conduct was brutal and shocking.[13] Although any sexual assault on a child is also brutal and shocking, the assaults in the present case were not unusually so. Accordingly, we conclude that, although the sexual assault cases involved conduct that was more brutal and shocking than that involved in the threatening and disorderly conduct cases, the disparity between the cases was not so great that the evidence related to the sexual assault cases was more prejudicial than probative in the threatening and disorderly conduct cases, especially given the trial court's finding that the cases were interwoven and the highly probative nature of the evidence. We conclude, therefore, that the trial court did not abuse its discretion when it joined the cases. See, e.g., *State* v. *Sanseverino*, 287 Conn. 608, 633, 949 A.2d 1156 (2008) (when cases were equally likely to arouse emotions of jurors, trial court did not abuse discretion when it denied defendant's motion to sever cases) (overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008)), superseded in part, 291 Conn. 574, 969 A.2d 710 (2009); *State* v. *Stevenson*, 43 Conn. App. 680, 691, 686 A.2d 500 (1996) ("when all of the cases sought to be consolidated are brutal or shocking, they may be joined properly, if consolidation does not cause a high risk of one case being tainted by the unusually shocking (e.g., sexual derangement) or brutal nature of the other, or others"), cert. denied, 240 Conn. 920, 692 A.2d 817 (1997); *State* v. *Hermann*, 38 Conn. App. 56, 62–63, 658 A.2d 148 (trial court properly denied defendant's motion

---

[13] We recognize that the trial court concluded that, although the threatening and disorderly conduct charges "involve violence, it's not to the extent [that] it's brutal or shocking violence on the defendant's part." The court had not yet heard the evidence supporting the charges, however, when it made this statement. Moreover, read in context, the court was merely observing that the conduct underlying the charges was not *so* brutal and shocking that it would improperly arouse the jurors' emotions in the sexual assault cases, an assessment with which we agree.

State *v.* James A.

to try charges of sexual assault and risk of injury to child separately from charge of interfering with officer because "counts involving sexual assault and risk of injury to children are not necessarily so brutal and shocking as to mandate severance . . . if the jury is properly instructed to consider the counts separately"), cert. denied, 235 Conn. 903, 665 A.2d 904 (1995);[14] cf. *State* v. *LaFleur*, supra, 307 Conn. 155 ("[when] evidence is cross admissible . . . our inquiry [into whether joinder was proper] ends"). We conclude, therefore, that the trial court properly joined the cases because the evidence in each case was cross admissible in the other cases.[15]

In any event, even if the defendant were correct that the evidence related to the sexual assault cases was not admissible to prove the threatening and disorderly conduct charges because it was unduly prejudicial, we would conclude that the joinder of the cases was harmless on this record. The evidence that the defendant violently threatened to decapitate multiple persons was overwhelming, as was the evidence that multiple persons were terrorized by the defendant's threatening and violent speech and conduct on the night of the wedding and the following day.[16] Although many of the witnesses

_____

[14] As we indicated, the jury in the present case was instructed that it must consider all of the counts separately. See footnote 6 of this opinion.

[15] In reaching this conclusion, we are mindful of the defendant's contention that joining the sexual assault cases with the threatening and disorderly conduct cases meant that the jury was confronted with a ten count information instead of a two count information, and that this made it more likely that the jury would think of him as a "bad person and more likely to be guilty." We cannot conclude that the number of counts in the sexual assault cases, standing alone, required the trial court to deny the state's motion to consolidate under the circumstances of this case.

[16] To the extent that the defendant contends that, without the evidence related to the sexual assault cases, there would have been only weak evidence of his *intent* to terrorize, any such claim would support our conclusion that the evidence was highly relevant to the threatening and disorderly conduct charges.

State *v.* James A.

to the events on the night of the wedding had consumed alcoholic beverages at the wedding reception and the after-party, the defendant has pointed to no evidence that would support a finding that they were so inebriated that their capacity to perceive or remember the events was significantly impaired. In fact, M expressly testified that, although he had had a "couple of beers" earlier in the day, he was sober during the after-party when he heard the defendant's death threats and observed his violent conduct. Moreover, all of the witnesses gave substantially consistent testimony about the events of that evening, and the jury reasonably could have concluded that any slight inconsistencies could be explained by the violent and chaotic nature of the events. Finally, and perhaps most significant, during his closing argument, defense counsel did not even attempt to contest the state's evidence with respect to the threatening and disorderly conduct charges. Rather, he made reference to the events on the night of the wedding only to point out that, when the police responded to the neighbor's noise complaint, no one told them about S's accusation that the defendant had sexually abused J. We conclude, therefore, that, even if the evidence related to the sexual assault cases was inadmissible in the threatening and disorderly conduct cases because it was more prejudicial than probative, the defendant has not established that the joinder of the cases substantially affected the verdict. See *State* v. *Payne*, supra, 303 Conn. 553 ("When an error is not of constitutional magnitude, the defendant bears the burden of demonstrating that the error was harmful. . . . The proper standard for review of a defendant's claim of harm is whether the jury's verdict was substantially swayed by the error." (Citation omitted; internal quotation marks omitted.)).

II

We next turn to the question of whether the trial court properly denied the defendant's request to testify

about the nonsexual nature of his prior felony record without permitting the prosecutor to elicit on cross-examination testimony that he had been convicted of seven counts of robbery. We conclude that the record is not adequate for review of this claim.

The following procedural history is relevant to this issue. Before trial, the trial court granted the defendant's motion in limine barring the state from asking its witnesses about the defendant's prior incarceration. During trial, the court ruled that, if the defendant testified, the state could not ask him about his prior convictions for robbery. The court also barred defense counsel from asking a state's witness about his convictions as the defendant's codefendant in the robbery case. The trial court concluded that the convictions were not relevant to either the defendant's or the witness' credibility.

Thereafter, the state called M as a witness. The prosecutor asked M whether he had heard the defendant say anything during the ruckus on the night of the wedding.[17] M stated that the defendant was yelling that he was not going back to jail. The prosecutor immediately interrupted the testimony and asked that the jury be sent out of the courtroom. He then asked the trial court to strike the testimony and to give a curative instruction, which the trial court did.[18]

The following day, the defendant sought permission to testify about the nonsexual nature of his prior felony record. He also asked the trial court to bar the prosecutor from eliciting any testimony on cross-examination that he had been convicted of robbery. Defense counsel,

---

[17] The prosecutor was attempting to elicit testimony about the defendant's threats to kill people.

[18] Specifically, the trial court stated that it was "going to strike the witness' last statement. I will order you [the jury] . . . to not consider that at any point in time in your deliberation[s]. Reminding you, and you will get full instructions, that, when a statement or an exhibit or an item is stricken, you cannot consider that as part of your deliberations."

State *v.* James A.

Tashun Bowden-Lewis, argued that the curative instruc-
tion was an insufficient remedy for M's disclosure
because "you can't unring the bell . . . ." In response,
the prosecutor pointed out that the defendant did not
have only one felony conviction, but seven, and argued
that the nature of the prior convictions was relevant to
the defendant's veracity. The prosecutor also pointed
out that the defendant was planning to call a character
witness and argued that the prosecutor was allowed to
cross-examine that witness about his knowledge of the
defendant's truthfulness and that the robbery convic-
tions were directly relevant to that issue. The trial court
ruled that, if the defendant testified about his prior
convictions, the state would be allowed "to inquire as
to the fact that he's a convicted felon, the name of the
felony or felonies, and that's it. We're not getting into
the details, because then we're getting into collateral
issues."

Bowden-Lewis then asked permission to have a brief
discussion with the defendant, which the trial court
granted. After a brief recess, the defendant took the
witness stand. Bowden-Lewis then had a brief discus-
sion with cocounsel, John Bowdren, and stated, "I just
have to address one thing with [the defendant] because
he just said to me—I apologize, can I have just two
minutes?" The defendant then apparently left the court-
room with Bowdren.[19] When they returned to the court-
room, Bowden-Lewis indicated that the defendant had
decided that he did not want to testify. The prosecutor
then argued that, because the defendant was not going
to testify, the defendant could not present testimony
about his truthfulness through a character witness. The

[19] The trial transcript does not expressly indicate that the defendant left
the courtroom, but it does indicate that, after a brief colloquy between the
trial court and Bowden-Lewis, Bowden-Lewis stated, "I'll wait for him to
come back out," and that the defendant was then brought back into the
courtroom.

State *v.* James A.

trial court agreed and reinstated its initial ruling that evidence about the defendant's prior convictions would not be admitted. The prosecutor then stated, "[m]ay we have one second Judge. I think we're going to talk a plea." After a brief, off-the-record discussion between counsel, Bowden-Lewis indicated that they were ready for the jury to be brought back into the courtroom, and the defendant continued his presentation of evidence.

We conclude that the record is inadequate to review the defendant's claim that the trial court improperly denied his request to testify about the nonsexual nature of his prior felony convictions without being subject to cross-examination on the specific nature of those convictions. First, nothing in the record indicates the reason for the defendant's decision not to testify, and it is certainly well within the realm of possibility that he would have made that decision, even if the trial court had barred the prosecutor from asking him about the specific nature of his prior convictions on cross-examination. Second, nothing in the record before the trial court indicates whether the defendant intended to testify *only* that his prior convictions were nonsexual or, instead, that he intended to testify concerning his lack of guilt on the charges he was facing.[20] If he intended

_____

[20] During the argument on the defendant's request to testify about the nonsexual nature of his prior felony record, defense counsel told the trial court that the defendant would testify "to the fact solely that he is a convicted felon of a nonsexual crime" and that counsel was "asking only for [the defendant] to be able to say that he is a convicted felon of a crime of a nonsexual nature . . . ." We do not interpret this language as necessarily meaning that the defendant intended to testify *only* about his prior convictions. Rather, it could mean that the only testimony that the defendant was going to give *concerning the convictions* were that they were for a nonsexual offense. We note in this regard that, in his brief to this court, the defendant argues that, as the result of the trial court's ruling, "[t]he jur[ors] did not hear him deny harming [J] and [L]. They did not hear him explain what he said on his wedding night. They did not hear him explain why he went to [A's] house, deny that he taunted [A] and [M], and deny that he charged two men who were pointing handguns at him." Thus, the defendant has suggested to this court that he intended to testify about his lack of guilt. He did not, however, make any such offer of proof to the trial court.

State *v.* James A.

to testify only that his prior convictions were for a nonsexual offense, testimony on cross-examination that the offense had been a robbery would have not have tended to establish the defendant's lack of veracity because the testimony would only have *corroborated* his testimony on direct examination.[21] If, on the other hand, he intended to testify concerning his lack of guilt, the fact that his prior convictions were for robbery would have been relevant to establish his lack of truthfulness on that issue. See *State* v. *Rivera*, 335 Conn. 720, 731, 240 A.3d 1039 (2020) ("[w]e have consistently recognized that crimes involving larcenous intent imply a general disposition toward dishonesty or a tendency to make false statements" (internal quotation marks omitted)).[22] Without knowing what the defendant intended to testify about, we cannot know whether the testimony that the state intended to elicit on cross-examination would have been relevant.[23] We conclude, therefore, that the defendant's claim is unreviewable for lack of an adequate record.

---

[21] Accordingly, we do not agree with the concurring justice that the fact that the defendant was previously convicted of robbery would affect the credibility of his testimony that his prior convictions were not for a sexual offense. With respect to the concurring justice's statement that we have concluded *sua sponte* that the record is not adequate for review, we note that that state contended in its brief to this court that "[t]he record does not disclose why [the defendant] changed his mind" about testifying and "is devoid of any evidence as to what the defendant's testimony would have been."

[22] We recognize that the trial court initially determined that the robbery convictions were not relevant to the defendant's lack of veracity. That determination would have been incorrect if the trial court believed that the defendant intended to testify about his lack of guilt, and nothing prevented the trial court from correcting an earlier incorrect ruling, especially when it was the defendant's own request that triggered the correction.

[23] We also note that, if the defendant wanted to testify about his lack of guilt, he could have simply withdrawn his request to testify about the nonsexual nature of his prior felony convictions and asked the trial court to keep in place its initial ruling that questions about the prior convictions would not be permitted on cross-examination. Thus, any harm caused by not presenting such testimony was self-inflicted.

State *v.* James A.

The judgment is affirmed.

In this opinion D'AURIA, MULLINS and KAHN, Js., concurred, and ECKER, J., concurred as to part I.

ROBINSON, C. J., with whom McDONALD, J., joins, and ECKER, J., joins as to part II, concurring in the judgment. I join in the judgment of the court upholding the conviction of the defendant, James A., of numerous crimes, including sexual assault and threatening offenses.[1] I write separately because I part company from the majority's analysis of the defendant's claims on appeal in two significant ways. First, I conclude that the trial court abused its discretion when it joined the defendant's threatening in the second degree and disorderly conduct charges (threatening case) for trial with his sexual assault, risk of injury to a child, and strangulation in the first degree charges (sexual assault case), but I ultimately agree with the majority that this improper joinder was harmless error not requiring reversal of the affected convictions, namely, those in the threatening case. Second, I reach the merits of and agree with the defendant's claim that the trial court improperly denied his request for permission to testify about his prior felony convictions without opening the door to disclosing the names of those underlying felonies as a remedy for an inadvertent disclosure about his prior incarceration by one of the state's witnesses. As with the first

---

[1] The trial court rendered judgments, in accordance with the jury's verdicts, convicting the defendant of the following offenses charged in the sexual assault case: three counts of sexual assault in the first degree, in violation of General Statutes § 53a-70 (a) (2); one count of sexual assault in the second degree, in violation of General Statutes § 53a-71 (a) (1); three counts of risk of injury to a child, in violation of General Statutes § 53a-21 (a) (2); and one count of strangulation in the first degree, in violation of General Statutes § 53a-64aa (a) (1) (B).

The trial court rendered judgments, in accordance with the jury's verdicts, of the following offenses charged in the threatening case: one count of threatening in the second degree, in violation of General Statutes § 53a-62 (a) (2); and one count of disorderly conduct, in violation of General Statutes § 53a-182 (a) (1).

State *v.* James A.

claim, I conclude that this ruling was harmless error not requiring reversal. Accordingly, I concur in the judgment of the court.[2]

I

I begin my discussion by addressing the defendant's joinder claim, which requires the court to consider the standard for cross admissibility for purposes of joining for trial, pursuant to Practice Book § 41-19,[3] the charges in the separate sexual assault and threatening cases. See footnote 1 of this opinion. As the majority aptly observes, "[the] General Statutes and rules of practice expressly authorize a trial court to order a defendant to be tried jointly on charges arising from separate cases." (Internal quotation marks omitted.) Part I of the majority opinion, quoting *State* v. *Rivera*, 260 Conn. 486, 490, 798 A.2d 958 (2002). In *State* v. *LaFleur*, 307 Conn. 115, 159, 51 A.3d 1048 (2012), and *State* v. *Payne*, 303 Conn. 538, 544–50, 34 A.3d 370 (2012), two cases discussing the standards for reviewing a trial court's ruling on a motion pertaining to joinder, "we rejected the notion of a blanket presumption in favor of joinder and clarified that, when charges are brought in separate informations, and the state seeks to join those informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. . . . The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible *or* that the defendant will not

_____

[2] I agree with the majority's comprehensive recitation of the facts, procedural history, and the parties' arguments in this case. For the sake of brevity, unless otherwise necessary, my discussion of this case's facts and procedural history is confined to my analysis of the defendant's specific claims on appeal.

[3] Practice Book § 41-19 provides: "The judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together."

State *v.* James A.

be unfairly prejudiced pursuant to the factors set forth in *State* v. *Boscarino*, [204 Conn. 714, 722–24, 529 A.2d 1260 (1987)].[4] Although the state bears the burden of proof in the trial court, [i]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . As we emphasized in *LaFleur*, our appellate standard of review remains intact. Accordingly, [i]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb. . . . *State* v. *Devon D.*, 321 Conn. 656, 664–65, 138 A.3d 849 (2016)." (Citation omitted; emphasis in original; footnote added; internal quotation marks omitted.) Part I of the majority opinion.

"A long line of cases establishes that the paramount concern is whether the defendant's right to a fair trial will be impaired. Therefore, in considering whether joinder is proper, this court has recognized that, whe[n] evidence of one incident would be admissible at the trial of the other incident, separate trials would provide the defendant no significant benefit. . . . Under such circumstances, the defendant would not ordinarily be substantially prejudiced by joinder of the offenses for a single trial. . . . Accordingly, we have found joinder to be proper [when] the evidence of other crimes or

_____

[4] In *State* v. *Boscarino*, supra, 204 Conn. 722–24, "we . . . identified several factors that a trial court should consider in deciding whether a severance [or denial of joinder] may be necessary to avoid undue prejudice resulting from consolidation of multiple charges for trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 156.

State *v.* James A.

uncharged misconduct [was] cross admissible at separate trials. . . . [When] evidence is cross admissible, therefore, our inquiry ends. . . . *State* v. *LaFleur*, supra, 307 Conn. 155; see *Leconte* v. *Commissioner of Correction*, 207 Conn. App. 306, 327, 262 A.3d 140 ([I]t is well established that [when] the evidence in one case is cross admissible at the trial of another case, the defendant will not be substantially prejudiced by joinder. . . . Our case law is clear that a court considering joinder need not apply the *Boscarino* factors if evidence in the cases is cross admissible'' . . .), cert. denied, 340 Conn. 902, 263 A.3d 387 (2021).'' (Internal quotation marks omitted.) Part I of the majority opinion.

I agree generally with the majority's response to the defendant's claims with respect to the requirements for establishing cross admissibility for purposes of joinder, and I particularly agree that, under *State* v. *Crenshaw*, 313 Conn. 69, 95 A.3d 1113 (2014), and *State* v. *LaFleur*, supra, 307 Conn. 115, the fact that evidence may be admitted only for a limited purpose in one of the cases to be joined does not defeat a finding of cross admissibility for purposes of joinder. See part I of the majority opinion. As the majority observes, requiring complete congruence as to the admissibility of the evidence in both cases is inconsistent with the principle that, "in making the discretionary, pretrial decision to join multiple cases, [the trial court] rules on whether the evidence *could* be admissible, not whether the evidence actually *is* admitted." (Emphasis in original; internal quotation marks omitted.) Id., quoting *State* v. *Crenshaw*, supra, 89. Moreover, requiring the state to establish full congruence would defeat the benefits of judicial economy and context for the trier that are afforded by joinder, with appropriate jury instructions serving to mitigate any prejudicial effect from that joinder.[5] See *State* v. *Crenshaw*, supra, 89–90.

_____
[5] Requiring complete congruence in the cross admissibility of the underlying evidence necessary to establish each charge could also effectively pre-

State *v.* James A.

I emphasize, however, that joinder on the basis of cross admissibility requires that evidence of the crimes set forth in each separate information be admissible at the trials of the other incidents. See *State* v. *LaFleur*, supra, 307 Conn. 154–55. Put differently, cross admissibility does not rely on the specific evidence that is required to prove every element of each of the crimes charged in each case but, rather, whether "evidence of one incident would be admissible at the trial of the other incident . . . ." (Internal quotation marks omitted.) *State* v. *Anderson*, 318 Conn. 680, 692, 122 A.3d 254 (2015); see *State* v. *Crenshaw*, supra, 313 Conn. 84 ("[w]e consistently have found joinder to be proper if we have concluded that the evidence of other crimes or uncharged misconduct would have been cross admissible at separate trials" (internal quotation marks omitted)). Thus, our inquiry is whether evidence of the conduct giving rise to the threatening and disorderly conduct charges could be admissible in the sexual assault case, and whether evidence of the conduct giving rise to the sexual assault, risk of injury, and strangulation charges could be admissible in the threatening case.[6] As the majority states, if we determine that the evidence is not cross admissible in each case, then we consider whether joinder is nevertheless proper insofar

vent any two cases from being cross admissible. It is not difficult to imagine, for instance, testimony regarding the age of a victim being necessary to establish an element of one crime but having no legal relevance to the commission of the second crime and, thus, being deemed inadmissible on that basis with respect to the trial for the second charge. Based on the defendant's rigid conception of cross admissibility, this scenario would preclude joinder of the two cases, despite *evidence of* both crimes being admissible in both cases.

[6] It appears that, given the posture of the present case, the majority frames its cross admissibility inquiry in terms of relevance, stating that evidence is cross admissible if it is relevant and has probative value exceeding any unfairly prejudicial effect. See part I of the majority opinion. Although evidence must always be relevant to be admissible, I emphasize that relevance is not the only evidentiary doctrine that permits, or potentially precludes, a finding of cross admissibility for joinder purposes. See *State* v. *Payne*, supra, 303 Conn. 543 n.3.

as the defendant has not been unfairly prejudiced under the *Boscarino* factors.

With respect to the first half of the cross admissibility inquiry, I agree with the majority's conclusion that the defendant's violent response to the accusation of sexual assault, which led to the threatening and disorderly conduct charges, was relevant to establishing his consciousness of guilt in the sexual assault case, as well as to proving fear on the part of J and L that led to the delayed disclosure of their sexual assault allegations. I further agree with the majority's conclusion that the prejudicial effect of this evidence did not outweigh its probative value in the sexual assault case and that joinder of the charges was not otherwise unduly prejudicial with respect to the defense of the sexual assault case.

Where I part company from the majority is the second half of the cross admissibility inquiry, namely, our consideration of the reverse—whether the trial court correctly determined that evidence of the conduct giving rise to the sexual assault case could be admissible in the threatening case. Like the majority, I agree with the state's argument that the evidence that the defendant sexually assaulted J and L establishes the requisite intent in the threatening case, namely, that the defendant threatened to commit a "crime of violence with the intent to terrorize another person . . . ." General Statutes § 53a-62 (a) (2).

Evidence of other crimes is admissible for nonpropensity purposes, "such as to show *intent,* an element [of] the crime, identity, malice, *motive* or a system of criminal activity." (Emphasis added; internal quotation marks omitted.) *State* v. *Anderson,* supra, 318 Conn. 693; see Conn. Code Evid. § 4-5 (a) and (c). "Such evidence is admissible if: (1) it is relevant and material to at least one of the circumstances encompassed by the exceptions; and (2) its probative value outweighs its

State *v.* James A.

prejudicial effect.'' *State* v. *James G.*, 268 Conn. 382, 390, 844 A.2d 810 (2004). For purposes of relevance, I cannot say that the evidence of the conduct giving rise to the sexual assault, risk of injury, and strangulation charges has no logical bearing on the probability that the defendant intended to terrorize the relatives of his victims following their disclosure of his sexual abuse. See, e.g., *State* v. *Bermudez*, 341 Conn. 233, 249, 267 A.3d 44 (2021) (''Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities [or be conclusive] . . . .'' (Internal quotation marks omitted.)). Nor can I say that the evidence bears no relevance toward establishing a motive for the defendant's threats and conduct. See *State* v. *Lopez*, 280 Conn. 779, 795, 911 A.2d 1099 (2007) (''[e]vidence of prior misconduct that tends to show that the defendant harbored hostility toward the intended victim of a violent crime is admissible to establish motive'').

However, I still must determine whether the probative value of the evidence of the specific acts of sexual assault outweighs its prejudicial effect. See, e.g., *State* v. *James G.*, supra, 268 Conn. 390. I part company with the majority on this point. If the probative value is outweighed by its prejudicial effect, then this evidence was inadmissible in the threatening case, and the evidence in the two cases is not cross admissible. ''[T]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will *improperly* arouse the emotions of the jur[ors].'' (Emphasisadded; internal quotation marks omitted.) *State* v.

State *v.* James A.

*Sandoval*, 263 Conn. 524, 544, 821 A.2d 247 (2003); see Conn. Code Evid. § 4-3.

Nothing in the record supports the inference that the trial court specifically considered the prejudicial effect that the sexual assault, risk of injury, and strangulation charges would have on the threatening case.[7] Nevertheless, detailed evidence that the defendant sexually assaulted two children on numerous occasions and strangled a child to the point of unconsciousness certainly would improperly arouse the emotions of the jurors in the threatening case to the extent that its prejudicial effect exceeds the probative value in that case. See *State* v. *Ellis*, 270 Conn. 337, 377, 852 A.2d 676 (2004) ("[t]he effect of testimony regarding the intimate details of sexual misconduct on a jury's ability to consider separate charges in a fair and impartial manner cannot be underestimated"). In my view, this evidence

---

[7] I acknowledge that I must review the entire record for whether we can infer that the trial court considered any unduly prejudicial effect of admitting evidence of the conduct giving rise to the sexual assault, risk of injury, and strangulation charges in the threatening case, and weigh it against the probative nature prior to its ruling on cross admissibility. See *State* v. *James G.*, supra, 268 Conn. 395. Although the trial court's discussion prior to deciding the state's motion to consolidate leaves me assured that it considered the prejudicial effect of the threatening and disorderly charges on the sexual assault case, it does not provide me with the same assurance that it completed the cross admissibility analysis by considering the prejudicial effect of the sexual assault, risk of injury, and strangulation charges on the threatening case. Specifically, the trial court's discussion expressly referenced "adding a disorderly conduct and a threatening charge to the two sex assault charges . . . ." Further, the trial court was certainly not considering the first degree sexual assault and first degree strangulation charges when it stated that the crimes were "not [violent] to the extent it's brutal or shocking violence on the defendant's part." Indeed, the trial court specifically stated that it was "setting aside the sex assault charges" in its discussion of whether the crimes were brutal or shocking. Additionally, the trial court also never directly addressed defense counsel's assertion during argument on the motion to consolidate that the "sexual assault cases certainly are shocking" and would prejudice the defense in the threatening case with mentions of "digital penetration [and] cunnilingus with minor children . . . ."

State *v.* James A.

served to elevate the defendant from someone whose alcohol fueled ill temper led him to commit acts that were both violent and offensive to one who is a genuine sexual predator.[8] This has, in my view, the effect of transforming the nature of the threatening case in the eyes of the jurors.

I acknowledge the state's arguments, echoed by the majority opinion, that the two cases were factually related and that "to place the threats and conduct [following the defendant's wedding] in context, it would be necessary at any trial on those charges to elicit evidence of [the defendant's] sexual assaults of J and L . . . ."[9] The majority also posits that evidence of the specific acts of sexual abuse is "relevant to the question of whether the persons at whom the threats were directed and others would interpret them as a genuine

[8] I respectfully suggest that the majority understates the gravity of the defendant's conduct in the sexual assault case when it acknowledges that "any sexual assault on a child is . . . brutal and shocking," but then characterizes "the assaults in the present case [as] not unusually so." Part I of the majority opinion. I suggest that the proper focus is not whether the sexually assaultive acts on J and L were more or less brutal than those committed in other child sexual abuse cases, although I disagree with the majority's suggestion that they were not extreme in their brazenness and violence given the strangulation aspects of this case. In any event, I respectfully submit that the details of the sexually assaultive conduct were sufficiently different in kind from the acts that gave rise to the threatening charges that they would arouse the jurors' emotions so as to consider the defendant a sexually violent predator, rather than a particularly obnoxious and angry drunk.

[9] Specifically, the state argues that defendants in threatening cases frequently argue that their words were "mere puffery," rendering it necessary for the jury in this case to learn about the defendant's sexual abuse of J and L to establish the defendant's motivation for making threats in violation of the statute. The state further argues that evidence of the sexual assaults would also be relevant to establish the elements of disorderly conduct pursuant to General Statutes § 53a-182 (a) (1), specifically, that the context of why M and A were patrolling outside the house and what led the defendant to the home is necessary to evaluate whether the defendant engaged in violent or tumultuous conduct intending to cause inconvenience, annoyance, or alarm.

State *v.* James A.

threat of violence or, instead, as drunken bluster.'' Part
I of the majority opinion. The majority questions rhetori-
cally "how the threatening and disorderly conduct
charges could be tried *without* introducing any evi-
dence related to the sexual assault cases.'' (Emphasis
in original.) Id. I respectfully disagree. That relevant
context, and the motive for the defendant's outbursts,
would have been amply provided by S's *accusations*
that the defendant sexually abused J and L. Indeed,
the evidence of S's accusations, including calling the
defendant a "child molester'' and a "pedophile son of
a bitch,'' is precisely what the state elicited in limited
fashion at trial to provide context for the defendant's
conduct on the nights leading to the threatening and
disorderly conduct charges.[10] Beyond those accusa-
tions, specific evidence of the defendant's sexually
assaultive acts against J and L, including his strangula-
tion of J, would serve only to inflame the jurors with
respect to the threatening case. Accordingly, my review
of the record shows that the prejudicial effect of the
evidence did outweigh its probative value, and the evi-
dence of the specific conduct giving rise to the sexual
assault case, therefore, was inadmissible in the threat-
ening case. Thus, the evidence was not cross admissible
with respect to the threatening case, and I move to an
analysis of the *Boscarino* factors to determine whether
joinder was proper.

In *State* v. *Boscarino*, supra, 204 Conn. 722–24, this
court "identified several factors that a trial court should
consider in deciding whether a severance [or denial of
joinder] may be necessary to avoid undue prejudice
resulting from consolidation of multiple charges for

---

[10] I note that, upon overruling defense counsel's hearsay objections to S's
statements, the trial court granted her request for jury instructions limiting
the use of S's statements calling the defendant a "child molester'' and a
"pedophile son of a bitch'' and indicated that they were not admitted for the
truth of the matter asserted but, rather, to show their effect on the listener.

trial. These factors include: (1) whether the charges involve discrete, easily distinguishable factual scenarios; (2) whether the crimes were of a violent nature or concerned brutal or shocking conduct on the defendant's part; and (3) the duration and complexity of the trial. . . . If any or all of these factors are present, a reviewing court must decide whether the trial court's jury instructions cured any prejudice that might have occurred." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 156.

As the majority aptly notes, there is substantial overlap between the second *Boscarino* factor and the analysis by which we determine whether otherwise relevant evidence is more prejudicial than probative for purposes of admissibility.[11] Thus, I turn briefly to the defendant's claims with respect to the second *Boscarino* factor.[12] With respect to the second *Boscarino* factor,

[11] I recognize that evaluating undue prejudice pursuant to § 4-3 of the Connecticut Code of Evidence in connection with the cross admissibility determination may be consistent with, and accomplishes the aim of, the second *Boscarino* factor. See, e.g., *State* v. *Best*, 337 Conn. 312, 322–23, 253 A.3d 458 (2020) ("[t]he test for determining whether evidence is unduly prejudicial is not whether it is damaging to the [party against whom the evidence is offered] but whether it will improperly arouse the emotions of the jur[ors]" (internal quotation marks omitted)). Thus, on this record, the trial court exceeded its obligations when it reviewed the *Boscarino* factors following its determination that the evidence was cross admissible. See *State* v. *LaFleur*, supra, 307 Conn. 155.

[12] With respect to the other two *Boscarino* factors, I observe that the defendant presents no discernable argument as to the third *Boscarino* factor, namely, the consideration of the duration and complexity of the trial, likely because this was not a particularly long or complex trial, with only four days of evidence. As to the first *Boscarino* factor, the defendant argues that, although the dates related to each case were discrete, there was "a confusing cast of witnesses, mostly related to each other," and that joining the trials changed the temporal and geographical scope of each case. In response, the state argues that there is little to no risk that the jury in the present case would have been confused in evaluating which evidence applied to which charge. I agree with the state on this point.

As the defendant notes in his brief to this court, the events leading to the charges in the two cases occurred on entirely different days. The informations concerned different victims, as the sexual assault case pertained to J

State *v.* James A.

the defendant argues that the crimes charged in the sexual assault case are both brutal and shocking, as they related to the repeated sexual assault and strangulation of two minor children, who were both members of the defendant's family. In response, the state posits instead that the defendant has failed to demonstrate "that the relative levels of brutal or shocking conduct unduly prejudiced one charge or another." Largely for the same reasons that led me to conclude that the prejudicial value of the specific evidence of sexually assaultive acts sharply outweighs its probative value for purposes of cross admissibility with the threatening case, I agree with the defendant and conclude that the second *Boscarino* factor was present.

"Whether one or more offenses involve brutal or shocking conduct likely to arouse the passions of the jurors must be ascertained by comparing the relative levels of violence used to perpetrate the offenses charged in each information." (Internal quotation marks omitted.) *State* v. *LaFleur*, supra, 307 Conn. 160. "The second factor in *Boscarino* permits joinder if, when comparing the defendant's conduct in separate incidents, his alleged conduct in one incident is not so shocking or brutal that the jury's ability to consider fairly and objectively the remainder of the charges is compromised." Id., 160–61. As both cases involved violence, we must determine whether the defendant's conduct in the sexual assault case, as the more violent of the crimes, was particularly shocking or brutal in comparison to his conduct in the threatening case.

and L, whereas the threatening case pertained to S, A, A's partner, and M. Each case involved different locations and distinct factual scenarios, with the disorderly conduct charges in particular arising at A's home in Prospect. Cf. *State* v. *Brown*, 195 Conn. App. 244, 252–53, 224 A.3d 905 (two counts of second degree breach of peace, among other charges, involving same location and victim, but different dates, times of day, and injuries, were discrete and easily distinguishable), cert. denied, 335 Conn. 902, 225 A.3d 685 (2020). Accordingly, I conclude that the first *Boscarino* factor, namely, confusion as to the applicable factual scenarios, was not present.

State *v.* James A.

Given the particular issues in this case, my conclusion that specific evidence of the defendant's sexually assaultive acts is more prejudicial than probative for purposes of admissibility in the threatening case because of their relative brutality reduces my analysis of the second *Boscarino* factor almost to a matter of form. As I stated previously, the sexual assault case contained allegations of digital penetration, cunnilingus, and analingus involving two minor children, as well as the strangulation of one minor child to the point of unconsciousness. In comparison, the threatening case involved violent threats and acts of property damage, namely, punching a hole in a wall and flipping over a table, and the defendant's making highly obscene gestures while throwing an open beer can at someone who was pointing a firearm at him. It is beyond cavil that the defendant's conduct in the sexual assault case, which was directed at two young children, was significantly more brutal and shocking than his conduct in the threatening case. See, e.g., *State* v. *Ellis*, supra, 270 Conn. 377 ("We have recognized that the crime of sexual assault [is] violent in nature, irrespective of whether it is accompanied by physical violence. Short of homicide, [sexual assault] is the *ultimate violation of self*. It is also a violent crime because it normally involves force, or the threat of force or intimidation, to overcome the will and the capacity of the victim to resist." (Emphasis in original; internal quotation marks omitted.)); cf. *State* v. *Payne*, supra, 303 Conn. 552 (murder case "was significantly more brutal and shocking" than jury tampering case); *State* v. *Ellis*, supra, 343–48, 378 (case in which defendant groped minor's breasts and in between her legs, and attempted to force her to perform oral sex on him and to kiss him, was "substantially more egregious" than cases in which defendant only groped victims' breasts). Thus, I conclude that the second *Boscarino* factor was present and that the evidence from the sexual assault

State *v.* James A.

case was prejudicial to the defendant in the threatening case.

As a result of the presence of a *Boscarino* factor, I now must determine whether the trial court's jury instructions cured any prejudice that might have occurred from the improper joinder, rendering that error harmless. See, e.g., *State* v. *Randolph*, 284 Conn. 328, 338, 933 A.2d 1158 (2007). In considering the curative effects of the jury instructions, I also consider the relative strength of the state's case as to the threatening charges.

"When reviewing claims of error, we examine first whether the trial court abused its discretion, and, if so, we next inquire whether the error was harmless. . . . When an error is not of constitutional magnitude, the defendant bears the burden of demonstrating that the error was harmful. . . . The proper standard for review of a defendant's claim of harm is whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 552–53.

Having reviewed the record, I have the requisite fair assurance that the improper joinder of the charges did not substantially sway the jury's verdict as to the threatening case. First, the jury instructions in this case mitigated the effect of the improper joinder by admonishing the jury to consider all counts separately. During its preliminary instructions to the jury, the trial court twice admonished the jury with the following statement: "Each charge against the defendant is set forth in the information as a separate count, and you must consider each count separately in deciding this case." The trial court again instructed the jury at the close of trial that

State *v.* James A.

it was to consider each charge separately.[13] See *State v. Payne*, supra, 303 Conn. 553–54 ("The record reveals that, during voir dire, the trial court instructed the potential jurors that, although the cases had been joined for judicial economy, the jurors, if called [on] to serve, must 'treat each and every case separately. . . .' The court expanded [on] this warning multiple times throughout the trial, including after the jury was impaneled, during the state's presentation of evidence, and in its final charge." (Footnotes omitted.)); *State* v. *Perez*, 147 Conn. App. 53, 110–11, 80 A.3d 103 (2013) (instructing jury as to separate nature of each charge at conclusion of state's evidence regarding one case, on first day of and during state's presentation of evidence regarding other case, and during jury charge), aff'd, 322 Conn. 118, 139 A.3d 654 (2016). These instructions have recently been held adequate "[to cure] the risk of substantial prejudice to the defendant and . . . [to preserve] the jury's ability to fairly and impartially consider the offenses charged in the jointly tried cases."[14] *State*

---

[13] In the present case, the trial court instructed the jury: "Now, the defendant is charged with ten separate counts in a long form information. The defendant is entitled to and must be given, by you, a separate and independent determination of whether he is guilty or not guilty as to each of the counts—each of the counts charged as a separate crime.

"The state is required to prove each element in each count beyond a reasonable doubt. Each count must be deliberated upon separately. The total number of counts charged does not add strength to the state's case. You may find that some evidence applies to more than one count in the information.

"The evidence, however, must be considered separately as to each element in each count. Each count is a separate entity. This includes a separate consideration as to the charges related to each victim and the evidence pertaining to each victim. You must consider each count separately and return a separate verdict for each count. A decision on one count does not bind your decision on another count. This means you may reach opposite verdicts on different counts."

[14] Although I conclude that the trial court's instructions, on the specific facts of the present case, were sufficient to mitigate any prejudice from the improper joinder, it would have been "preferable" for the court to have been more specific in instructing "the jury that the cases had been consolidated solely for the purpose of judicial economy," with the specific sexual

State *v.* James A.

v. *McKethan*, 184 Conn. App. 187, 200, 194 A.3d 293, cert. denied, 330 Conn. 931, 194 A.3d 779 (2018); see *State* v. *Norris*, 213 Conn. App. 253, 285, 287, 277 A.3d 839, cert. denied, 345 Conn. 910, 283 A.3d 980 (2022).

Second, given the general adequacy of these instructions, I consider the strength of the state's evidence in the threatening case. See, e.g., *State* v. *Payne*, supra, 303 Conn. 554; *State* v. *Norris*, supra, 213 Conn. App. 285–86. I agree with the majority that the evidence was overwhelming, as multiple witnesses—including one of the defendant's own witnesses—testified consistently about the defendant's violent conduct after S's accusations, including his threats to decapitate those who made allegations against him. Although, as the defendant points out, all the witnesses had consumed at least some alcoholic beverages at the wedding prior to witnessing the defendant's conduct, there is no evidence that any of those witnesses were under the influence of alcohol to the extent it affected their perception. Indeed, all the witnesses testified that they had sobered up by that point, with no evidence in the record suggesting otherwise. Further, the accounts of the defendant's conduct at the after-party in Naugatuck, specifically, his punching holes in the wall, are corroborated by photographic evidence of the repairs to the wall. Moreover, the testimony of Sergeant Matthew Geddes established the disorderly conduct charge portion of the threatening case without challenge, insofar as he testified that the defendant was the primary aggressor during the altercation with A and M during which M shot

assault allegations not to be considered as proof in the threatening cases. *State* v. *Norris*, 213 Conn. App. 253, 287, 277 A.3d 839, cert. denied, 345 Conn. 910, 283 A.3d 980 (2022). This instruction would have been consistent with the limiting instruction it gave with respect to S's accusatory statements that precipitated his conduct at the after-party, made in response to defense counsel's hearsay objection. See footnote 10 of this opinion. I note, however, that the defendant did not request a specific instruction to this effect with respect to joinder.

State *v.* James A.

him. See footnote 3 of the majority opinion and accompanying text.

Finally, and most telling, defense counsel's closing argument indicates that the threatening charges were not a significant factual issue in the trial of this joined case, insofar as defense counsel did not contest the underlying allegations, instead focusing on the sexual assault charges and referring to the events on the night of the wedding only to point out that, when the police responded to a neighbor's noise complaint during the after-party, no one in the family told them about S's accusation that the defendant had sexually abused J and L. See, e.g., *State* v. *Osimanti*, 299 Conn. 1, 20–23, 6 A.3d 790 (2010) (reviewing summations to discern significant factual issues in case); cf. *State* v. *Favoccia*, 306 Conn. 770, 811–13, 51 A.3d 1002 (2012) (reviewing prosecutor's summation in determining that improperly admitted expert testimony with effect of vouching for teenage victim was harmful given extent to which victim's credibility was significant issue in sexual assault trial). Indeed, in strategically conceding that the defendant was not "a saint," while simultaneously making the point that he was also not a child molester, defense counsel acknowledged significant portions of the events, including that the defendant "was drunk the night of the wedding," that he had thrown the wedding ring at D during their altercation, and that "things got out of hand" to the point that M shot him the following evening. To this point, in concluding her closing, defense counsel asked only whether the state had met its burden of proof with respect to the sexual assault and strangulation charges. Accordingly, given the strength of the state's evidence in the threatening case and the jury instructions, I have a fair assurance that the otherwise improper joinder of the threatening case with the sexual assault case was harmless error not requiring reversal.

State *v.* James A.

## II

I next address the defendant's claim that the trial court's instruction to the jury to disregard a statement by M referring to the defendant's prior incarceration was insufficient to remedy the prejudice resulting from that improper testimony and, therefore, that the trial court abused its discretion by denying the defendant his requested additional remedy of allowing him to testify as to the nonsexual nature of his prior felony record without opening the door to disclosing the names of the underlying felonies. The defendant also argues that, because the state had a weak case as to each of the charges, the error, which functioned to preclude the defendant from testifying in his own defense, was not harmless. In response, the state argues that the trial court was well within its discretion to rule that, if the defendant testified as to his prior felony record, then the state could inquire into the names of his prior felony convictions, and that, even if the trial court's ruling was an abuse of its discretion, any error was harmless. Although I agree with the defendant's argument that the trial court abused its discretion by denying him his requested remedy, I also agree with the state that the error was harmless and does not require reversal of the convictions.

The record reveals the following additional facts and procedural history that are relevant to our consideration of this claim. On the first day of trial, prior to bringing out the jury, defense counsel asked the trial court for a ruling on the defendant's motion in limine to limit the introduction of evidence of his prior convictions. The prosecutor responded that he had already "admonished all of [the state's] witnesses" and "made them aware of what they are not allowed to say . . . in court." Based on the prosecutor's response, the court stated that, "technically," it would grant the defendant's motion.

State *v.* James A.

During the trial, the prosecutor conducted a direct examination of M, the victims' grandfather. While testifying about the night of the defendant's wedding to D and the commotion that had ensued at the after-party, the prosecutor asked M whether he had heard the defendant say anything. M answered that the defendant "was just yelling [that] he wasn't going back to jail . . . ." The prosecutor immediately interjected and asked that the jury be excused. The prosecutor then asked the court to strike the statement from the record and informed the court that the witness had been "admonished repeatedly not to say anything about" the defendant's history of incarceration, to which M responded, "[y]eah, I was." Both parties agreed that the testimony should be stricken and that a curative instruction should be given to the jury. Upon the jury's return, the trial court promptly stated: "I'm going to strike [M's] last statement. I will order you . . . to not consider that at any point in time in your deliberation[s]. Reminding you, and you will get full instructions, that, when a statement or an exhibit or an item is stricken, you cannot consider that as part of your deliberations."[15] The prosecutor then continued with his examination, asking M leading questions to avoid any other improper disclosures.

The next day, following the close of the state's case-in-chief, defense counsel asked the trial court to modify its ruling regarding the defendant's prior convictions. Defense counsel noted that, the day before, M had implied that the defendant had a prior criminal record when he mentioned the defendant's statement that he was "not going back to jail . . . ." Defense counsel thus sought permission for the defendant to testify that he was "a convicted felon of a nonsexual crime," while

---

[15] While instructing the jury following summations, the trial court reiterated: "Any testimony that has been stricken or excluded, again, is not evidence."

State *v.* James A.

also precluding the state from mentioning that those felony convictions were for robberies or the details of those crimes. The prosecutor responded that the defendant's prior record did not consist of one felony conviction but, rather, of seven convictions, and argued that, if evidence of the felonies came in, they should be named because they were relevant to his truthfulness and veracity, particularly because the defendant planned to present a character witness in his defense. The trial court denied defense counsel's request, reasoning that the jury had been instructed to ignore the improper testimony and that, if the defendant "open[ed] the door" to the convictions, the court would allow the prosecutor to inquire as to the names of the felonies but not the details, so as to avoid getting into collateral issues.

The issue before us is whether the trial court abused its discretion in determining that, if the defendant testified about the nonsexual nature of his prior felony convictions as a remedy for M's inadvertent disclosure of the defendant's past incarceration, he necessarily would have opened the door to disclosing the names of the underlying felonies through cross-examination by the state.[16] Section 6-8 (a) of the Connecticut Code

[16] I note that the majority concludes, sua sponte, that the record is inadequate for review of this claim because it does not squarely reflect (1) the reason for the defendant's ultimate decision not to testify, and (2) whether the defendant intended to testify only that his prior conviction was nonsexual, or instead, deny his guilt with respect to the charged offenses. See part II of the majority opinion. I respectfully disagree.

First, given the ample arguments offered by counsel and the trial court's clear ruling on this point, the absence of this proffer relates to the strength of the defendant's evidentiary claims on their merits, and not whether the record is adequate for review. Consistent with the state's not challenging the adequacy of the record for review, I believe that the majority's analysis conflates the adequacy of the record for review with the extent to which the defendant has established the merits of his claim that the trial court abused its discretion by denying him permission to testify as to the nonsexual nature of his criminal record. Because a review of the transcripts fully establishes what happened before the trial court, thus setting the factual predicate for the defendant's claim on appeal, I conclude that it is adequate

State *v.* James A.

of Evidence governs the scope of cross-examination and subsequent examinations.[17] "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have opened the door to rebuttal by the opposing party." (Internal quotation marks omitted.) *State* v. *Mark T.*, 339 Conn. 225, 236, 260 A.3d 402 (2021). "Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it [*when*] *the party initiating inquiry has made unfair use of the evidence.* . . . [T]his rule operates to prevent a defendant from successfully excluding inadmissible prosecution evidence and then selectively introducing pieces of this evidence for his own advantage, without allowing the prosecution to place the evidence in its proper context." (Emphasis added; internal quotation marks omitted.) *State* v. *Payne*, supra, 303 Conn. 557. "In determining whether otherwise inadmissible evidence should be admitted to rebut evidence offered by an opposing party, the trial court must carefully consider whether the circumstances of the case warrant further inquiry into the subject matter . . . and *should permit it only to the extent necessary to remove any unfair prejudice* [that] might otherwise have ensued from the original evidence . . . . Accordingly, the trial

---

for review and reach the merits of the defendant's claims. See, e.g., *State* v. *Correa*, 340 Conn. 619, 682–83, 264 A.3d 894 (2021); *State* v. *Edmonds*, 323 Conn. 34, 64, 145 A.3d 861 (2016); *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 232–33, 828 A.2d 64 (2003).

Second, in any event, the topics of the defendant's proposed testimony are not outcome determinative with respect to the correctness of this particular ruling because his veracity and credibility would have become relevant as soon as he took the stand to testify as to *any* topic in his own defense.

[17] Section 6-8 (a) of the Connecticut Code of Evidence provides: "Cross-examination and subsequent examinations shall be limited to the subject matter of the preceding examination and matters affecting the credibility of the witness, except in the discretion of the court."

State *v.* James A.

court should balance the harm to the state in restricting
the inquiry with the prejudice suffered by the defendant
in allowing the rebuttal. . . . We will not overturn the
trial court's decision unless the trial court has abused its
discretion.'' (Emphasis added; internal quotation marks
omitted.) Id. "In determining whether there has been
an abuse of discretion, every reasonable presumption
should be made in favor of the correctness of the trial
court's ruling . . . .'' (Internal quotation marks omit-
ted.) *State* v. *Mark T.*, supra, 232.

The trial court's decision indicates that it determined
that the harm to the state in restricting the inquiry
about the exact convictions would be greater than the
prejudice the defendant would have suffered from
allowing that questioning by the state. The trial court
did not, however, discuss what the harm to the state
would have been from the defendant's proffered testi-
mony. Nor did the state offer any principled reason as
to why it insisted on inquiring into the names of the
felonies[18] when the defendant's request was made solely
*because of misconduct committed by the state's wit-
ness* in the first instance. This is exactly what our case
law warns against. See *State* v. *Griggs*, 288 Conn. 116,
141, 951 A.2d 531 (2008) (''[t]he doctrine of opening the
door cannot . . . be subverted into a rule for injection
of prejudice'' (internal quotation marks omitted)). I con-
clude that the trial court should have considered
whether the circumstances of the case warranted fur-
ther inquiry into the subject matter, as well as the extent
to which the further inquiry by the state was necessary
to remove any prejudice introduced by the defendant's
proposed testimony, namely, that his prior convictions

_____

[18] As I stated, the prosecutor argued that further inquiry would be relevant
to the defendant's truthfulness and veracity. However, the trial court had
already ruled that the prior convictions were not relevant for use against
the defendant, or his cohort in the robberies, who had already testified as
a witness for the state without the prior convictions being introduced.

State *v.* James A.

were of a nonsexual nature. This is particularly so given that the defendant's testimony was proposed as a curative measure to address the prejudicial effect of improper testimony from one of the *state's* witnesses in the first instance. Thus, I conclude that the trial court abused its discretion in allowing the prosecutor to inquire further into the specific nature of the defendant's felony record given the circumstances under which the defendant proposed to testify.

I acknowledge that the trial court stated that it would limit the rebuttal evidence to only the names of the felonies to avoid raising collateral issues. Additionally, the trial court struck M's disclosure from the record and instructed the jury that it was prohibited from considering the testimony it had heard prior to its dismissal. However, our case law does not support a conclusion that the trial court was within its discretion when it concluded that the defendant would have opened the door to further inquiry by testifying about the nonsexual nature of his prior convictions, given that it was offered solely to remedy the prejudicial effect of M's improper testimony about the defendant's history of incarceration in the first instance. Cf. *State* v. *Griggs*, supra, 288 Conn. 139–40 (trial court did not abuse its discretion in concluding that defendant opened door to evidence of his four domestic violence convictions involving assaultive or threatening behavior when defendant testified "that he had only '[a] couple' of domestic violence convictions and had never been engaged in any kind of physical assault"); *State* v. *Gonzalez*, 272 Conn. 515, 543–44, 864 A.2d 847 (2005) (trial court did not abuse its discretion in concluding that defendant opened door to evidence to rebut testimony introduced by defense regarding witness' disbelief of allegations); *State* v. *Phillips*, 102 Conn. App. 716, 733–37, 927 A.2d 931 (trial court did not abuse its discretion in admitting evidence of prior conviction when defendant's testimony implied

State *v.* James A.

that he had no prior convictions), cert. denied, 284
Conn. 923, 933 A.2d 727 (2007). The present case is also
distinguishable from those cases in which the trial court
properly allowed further inquiry in order to cure preju-
dice caused by the defendant's own testimony, insofar
as the purpose of the defendant's proposed testimony
in the present case was to cure prejudice occasioned
in the first instance by the improper testimony of M,
who was the *state's* witness.[19] Cf. *State* v. *Graham*, 200
Conn. 9, 14, 509 A.2d 493 (1986) ("The introduction of
the other crimes evidence *was not essential* to cure
the unfairness, if any, that the state may have suffered
by . . . defense counsel's limited inquiry into the other
robberies. The trial court therefore abused its discretion
. . . ." (Emphasis added.)).

The jury heard an inadmissible statement from the
state's witness that the defendant desired to remedy
with a brief reference to the nonsexual nature of his
prior convictions, and there is nothing in the record or
presented by the state in the present appeal as to how
this testimony would have harmed the state, an inquiry
required by the opening the door doctrine. See *State* v.
*Payne*, supra, 303 Conn. 557. On the other hand, the
jury's hearing further testimony about convictions that
are considered to speak to truth and veracity would
undoubtedly have introduced additional prejudice to
the defendant, on top of any created in the first instance
by M's improper testimony about the defendant's his-
tory of incarceration. Therefore, it was unreasonable
for the trial court to determine that the harm to the
state in restricting the inquiry about the exact convic-
tions would be greater than the prejudice the defendant

---

[19] I also note that the opening the door doctrine "operates to prevent a
defendant from successfully excluding inadmissible prosecution evidence
and then selectively introducing pieces of this evidence for his own advan-
tage, without allowing the prosecution to place the evidence in its proper
context." (Internal quotation marks omitted.) *State* v. *Brown*, 309 Conn.
469, 479, 72 A.3d 48 (2013). This was not the concern in the present case.

State *v.* James A.

would have suffered from allowing further inquiry by the state.[20] Accordingly, I conclude that the trial court abused its discretion in determining that the defendant's proposed testimony regarding his prior felony convictions opened the door to inquiry by the state regarding the names of the underlying felonies.

I now must determine whether this error was harmless. "The law governing harmless error for nonconstitutional evidentiary claims is well settled. When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most [important], we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019). Accordingly, I must consider whether the jury's not hearing that the defendant's prior convictions were of a nonsexual nature substantially affected the verdict.

[20] Although there are certainly other measures the defendant could have requested, and the trial court could have taken, to further remedy the inadvertent disclosure, the question presented here is the narrow evidentiary issue of the limited circumstances in which testimony "opens the door" to inquiry into inadmissible evidence.

State *v.* James A.

The defendant argues that, without his proposed testimony, the jury might have speculated as to whether his prior felony convictions were of a sexual nature and then made an impermissible propensity inference regarding the sexual assault case. See *State* v. *George A.*, 308 Conn. 274, 293, 63 A.3d 918 (2013) (evidence to establish propensity in sex related cases is admissible only if certain conditions are met). However, to determine that the jury might have drawn this inference because of the defendant's inability to testify about the nonsexual nature of his prior convictions, there must be some indication that the jury did not follow the trial court's instruction to disregard M's disclosure about the defendant's wish not to return to jail. See, e.g., *State* v. *Holley*, 327 Conn. 576, 618, 175 A.3d 514 (2018); see also id., 629. The defendant does not argue that there is any indication of such but, instead, argues that the trial court's "rote reliance" on this legal principle was an abuse of its discretion. Not only has this court repeatedly reaffirmed the principle that the jury is presumed to have followed the trial court's instruction in the absence of any indication to the contrary, but we have also stated that "instructions are far more effective in mitigating the harm of potentially improper evidence when delivered contemporaneously with the admission of that evidence, and addressed specifically thereto." (Internal quotation marks omitted.) Id., 618. In the present case, the jury was excused immediately following the improper statement at issue, and, upon its return, the trial court promptly stated that it was going to strike M's last statement and that it was not to be considered at any point during deliberations. Thus, I will presume that the jury followed the trial court's instruction to disregard M's comment and, thus, did not draw an impermissible propensity inference.

Harmlessness is further supported by the collateral nature of the defendant's proposed testimony. To the

State *v.* James A.

extent any testimony improperly was excluded, it was not central to, or even a part of, the defense. See *State* v. *Rinaldi*, 220 Conn. 345, 357–58, 599 A.2d 1 (1991) (improper exclusion of evidence central to defendant's defense was not harmless error). The testimony did not, for example, relate to the credibility of a significant witness who had testified at the trial. Cf. *State* v. *Culbreath*, 340 Conn. 167, 197, 263 A.3d 350 (2021) ("[when] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error" (internal quotation marks omitted)). The proposed testimony concerned only one statement that the jury is presumed to have disregarded, as I have noted.

Moreover, despite the defendant's argument to the contrary, the trial court's conclusion, although improper, did not specifically preclude the defendant from testifying as to the nonsexual nature of his prior convictions, and it certainly did not preclude the defendant from denying the allegations against him. Finally, as detailed in the majority opinion, the evidence was overwhelming as to all the charged offenses, with substantial corroboration of the various sexual assault charges. Accordingly, I have a fair assurance that the improperly excluded testimony did not substantially affect the verdict in the sexual assault case.

Because I would affirm the defendant's convictions, but for reasons different from those stated in the majority opinion, I concur in the judgment of the court.